**UNITED STATES of America,
Appellant,**

v.

**Gurmeet Singh DHINSA,
Defendant–Appellee.**

**Docket No. 98–1605**

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1998.

Decided Dec. 22, 1998.

Opinion Decided March 26, 1999.

David C. James, Assistant United States Attorney, Brooklyn, N.Y. (Zachary W. Carter, United States Attorney for the Eastern District of New York, Kristin M. Cappel, Assistant United States Attorney, on the brief) for Appellant.

Gerald L. Shargel, New York, N.Y. (Jeffrey Lichtman, Marc Fernich, Seth Ginsberg, on the brief) for Defendant–Appellee.

Before: WINTER, Chief Judge, JACOBS and POOLER, Circuit Judges.

POOLER, Circuit Judge

The government appeals an October 19, 1998, order of the United States District Court for the Eastern District of New York (Edward R. Korman, *Judge*) granting two suppression motions of defendant Gurmeet Singh Dhinsa. In a previously issued order, we reversed the rulings, and we now explain the bases for those reversals.

The district court's first ruling suppressed the fruits of a car stop and subsequent search. This ruling causes us to revisit the familiar issue of whether a law enforcement officer's subjective intentions can vitiate otherwise existing probable cause to stop a motor vehicle. However, the facts in this case differ somewhat from the usual scenario in that the detectives who stopped Dhinsa observed him commit a traffic violation before the stop but testified that the violation played no role in their decision to stop the car. Because the detectives had objective cause to stop the car, we conclude that their subjective motivation was irrelevant and that the stop was constitutionally permissible.

The second ruling we address occurred in an unusual procedural context. Judge Korman made findings supporting admission of the fruits of a purported inventory search of Dhinsa's car. However, the district court disregarded these findings and granted a suppression order because the defendant would not have been able to appeal from an order denying suppression without first standing trial in an anticipated lengthy capital proceeding. While we sympathize with the district court's institutional concerns, we do not approve its solution of entering an order inconsistent with its findings. We therefore summarily reverse the order.

## BACKGROUND

On August 22, 1997, a grand jury charged Dhinsa in a 29–count superseding indictment with crimes including racketeering, murder, conspiracy to commit murder, attempted murder, kidnapping, and witness intimidation. The government charged that Dhinsa, who owned gas stations throughout the New York City area, and members of a criminal enterprise that Dhinsa directed rigged gasoline pumps so that customers were charged for more gasoline than they actually received. The government further charged that members of the criminal enterprise committed various violent crimes to cover up and further their fraudulent scheme.

On July 1, 1997, Detectives Brian Quinn and Louis Pia of the Queens homicide squad of the New York City Police Department went to the Queens neighborhood of an individual who allegedly had received death threats from Dhinsa. The two detectives' supervisor, Sergeant Michael Conroy, had instructed Quinn and Pia to pick up this individual and his family and take them to a safe location. However, shortly before the detectives reached the pick-up location, Pia received a coded message on his pager instructing him to cancel the pick-up and call Conroy. Quinn drove past the pick-up location to a phone booth approximately two to two and a half blocks away and parked the unmarked pa-

trol car.[1] As Quinn approached the phone booth, he noticed an olive-skinned man in a Lincoln Town Car pull up on the opposite side of the street. During Quinn's conversation with Conroy, the driver of the Lincoln stared at Quinn. Consequently, Quinn asked Conroy if the Lincoln had anything to do with the investigation. After checking, Conroy responded that to his knowledge it did not. When Quinn got back in the car, he told Pia about the individual who had been staring at him. Pia also noticed the driver staring at him and at the patrol car. The two detectives agreed that they should pull over the Lincoln. Quinn then made a u-turn, and the driver of the Lincoln pulled away from the curb. The two detectives followed the Lincoln for about two blocks and observed its driver change lanes without signaling. However, both officers testified that the traffic violation played no role in their decision to make the stop and they did not intend to ticket the driver. Instead, Pia testified that he acted out of a desire to identify the man who was staring at him and a concern that the driver might have been conducting a surveillance of the person whose life had been threatened. Quinn was concerned because the driver had been staring at him.

After observing the traffic violation, Quinn and Pia stopped the Lincoln. Quinn recognized the driver as Dhinsa and asked him what he was doing in the neighborhood and who owned the car. Dhinsa responded that he was in the neighborhood to pick up receipts from one of his gas stations, one of his mechanics owned the car, and the registration papers were in the glove box. Dhinsa, Quinn, and Pia also briefly discussed the possibility of the detectives earning money by picking up receipts for Dhinsa, and Quinn and Dhinsa exchanged pager numbers. Next, Quinn took Dhinsa's car keys, opened the passenger-side front door and the glove box, and

examined a packet containing the registration and other papers. Quinn also asked for permission to open the trunk. When Quinn opened the trunk, he observed circuit boards for gas pumps. Quinn then closed the trunk and returned the contents of the glove box to Dhinsa.

Detectives arrested Dhinsa on July 7, 1997. On the same date, the detectives seized Dhinsa's black Lexus, which they believed Dhinsa had used in connection with a murder. After the detectives brought the Lexus to their precinct house, Sergeant Conroy instructed Detectives Rakesh Verma and Jim Tampellini to conduct an inventory search to record property taken into police custody. Verma, however, believed that he also could look for items of investigatory or evidentiary value. Verma testified that he and Tampellini searched the trunk, glove compartment, console, and passenger area of the Lexus as well as a "stash" or "trap" compartment. During the course of the search, Verma observed many loose papers including a piece of paper bearing the name of a cooperating witness and a paper containing information about the car the cooperator was driving at the time of his arrest. Verma also saw a life insurance policy in the name of Gurdial Singh, a murder victim, and New York City Department of Consumer Affairs metal seals, warning stickers, and inspection stickers. After observing these items, Verma brought many of the materials and papers into the precinct, and the detectives copied the papers. They did not make an inventory list.

In pretrial motions, Dhinsa moved, among other things, to suppress the fruits of both the July 1, 1997, car stop and search and the July 7, 1997, inventory search. After conducting hearings, the district court granted both motions. Although the court somewhat reluctantly credited the detectives' testimony that they observed Dhinsa committing a traffic

1. Both Quinn and Pia originally testified that the distance between the pick-up location and the phone booth was only half a block.

violation on July 1, 1997, it suppressed the fruits of that search because both detectives testified that the traffic violation did not cause them to stop Dhinsa. With regard to the July 7, 1997, search, the court held that the seizure of the car itself was "entirely reasonable" but that the detectives initially did not have probable cause to search the Lexus for evidence of the murder. However, the court also found that the search was permissible because (1) Conroy directed Verma to conduct an inventory search; (2) Verma erroneously believed he could conduct an investigatory search; and (3) regardless of Verma's intent or belief, the scope of the search he conducted did not exceed the permissible bounds of an inventory search until items he observed in plain view supplied him with probable cause to conduct a more extensive search. Notwithstanding these findings, Judge Korman went on to rule in Dhinsa's favor because the inventory search presented a close question and the defendant would have no opportunity to appeal denial of the suppression motion prior to trial. Judge Korman suggested that the unusual complexity and anticipated length of Dhinsa's capital trial justified holding for Dhinsa despite findings of fact and law that favored the government.

After we issued our order reversing the suppression order, Dhinsa's trial proceeded in district court. The jury convicted Dhinsa on several counts including racketeering, kidnapping, and murder but acquitted him on other counts.

## DISCUSSION

### I. Standard of Review

In reviewing a suppression order, we reverse the district court's factual findings only for clear error but review its legal conclusions de novo. *See United States v. Miller,* 148 F.3d 207, 213 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999).

### II. The July 1, 1997, Car Stop

The government states in its brief on appeal that it seeks to reverse the district court's order regarding the car stop only to the extent that the order precludes the government from introducing evidence of (1) the detectives' identification of Dhinsa after the stop; (2) Dhinsa's explanation of why he was in the area; (3) Dhinsa's statements concerning ownership of the car; and (4) the exchange of contact numbers. Because the government did not seek to introduce testimony concerning the contents of the glove box or trunk, we focus our analysis solely on the permissibility of the original stop and do not consider the reasonableness of subsequent searches.

Dhinsa suggests two principal bases for affirming the district court's order. First, he contends that the district court was right on the law, that is, the traffic violation did not justify the stop because it did not motivate the detectives' actions. In a slight variation on this contention, Dhinsa suggested at oral argument that a recent Supreme Court decision, *Knowles v. Iowa,* —— U.S. ——, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), establishes that the detectives acted unconstitutionally because they did not give Dhinsa a ticket after stopping him. Alternatively, Dhinsa argues that the district court was wrong on the facts because there was no credible basis for its finding that the officers witnessed a traffic violation.

"[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren v. United States,* 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Therefore, a police officer who observes a traffic violation may stop a car without regard to what a "reasonable officer" would do under the circumstances and without regard to the officer's own subjective intent. *See id.* at 813, 815–19, 116 S.Ct. 1769; *see also United States v. Scopo,* 19 F.3d 777, 782–83 (2d Cir.1994). In other words, an officer's use of a traffic

violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance.

■ The district court found that *Whren* and other "pretext" cases do not apply to Dhinsa's situation because the alleged traffic violation had nothing to do with the detectives' decision to stop Dhinsa and the detectives neither arrested nor ticketed Dhinsa. The district court and Dhinsa reason that a law enforcement officer cannot use an observed traffic violation to justify a traffic stop unless the traffic violation motivated the officer at least in part. Dhinsa contends that the Supreme Court held as it did in *Whren* because it is difficult as a practical matter to discern an officer's subjective intent or identify what a reasonable officer would do. Because Quinn and Pia frankly stated that they did not rely on the traffic violation as a basis for the July 1 stop, Dhinsa argues that (1) there was no pretext and (2) the only reason for the stop was to investigate Dhinsa's staring, a motive that the district court found insufficient and on which the government no longer relies.

Dhinsa's characterization of the *Whren* rationale conflicts with the holding in *Whren*. Admittedly, the Supreme Court discussed the difficulty of "plumb[ing] the collective consciousness of law enforcement in order to determine whether a 'reasonable officer' would have been moved to act upon [a] traffic violation." *Whren*, 517 U.S. at 815, 116 S.Ct. 1769. However, the Court held only that where police have probable cause to believe a driver has violated the traffic code, they may stop that driver. *See id.* at 819, 116 S.Ct. 1769. Not incidentally, one of the arresting offi-

cers in *Whren* testified that he had no intent to issue a ticket based on the driver's observed traffic violation. *United States v. Whren*, 53 F.3d 371, 373 (D.C.Cir. 1995), *aff'd*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

A fair reading of *Whren* and other car stop cases leads to the conclusion that an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation.[2] First, the Supreme Court did not premise its holding in *Whren* on a finding that a traffic violation even partially motivated the searching officers. Second, *Whren* and other Fourth Amendment cases require that we judge the reasonableness of an officer's actions based on the objective circumstances surrounding her actions and not on her subjective intent. *See Whren*, 517 U.S. at 814, 116 S.Ct. 1769; *see also Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 420–21, 136 L.Ed.2d 347 (1996); *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Therefore, regardless of the subjective intent of Quinn and Pia, we must reverse Judge Korman's suppression order because he found that the officers observed a traffic violation, an objective circumstance that justifies a traffic stop. *See Scott*, 436 U.S. at 138, 98 S.Ct. 1717. (stating that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

■ We also reject Dhinsa's argument—based on *Knowles*—that the offi-

2. Dhinsa argues that our decision in *Scopo* requires that the traffic violation at least serve as partial motivation for the stop. Dhinsa's argument relies on our quotation of the following language from *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (en banc): "We focus ... on whether this particular officer ... had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." *Scopo*, 19 F.3d at 784 (quoting

*Ferguson*, 8 F.3d at 391). This reliance on a quotation of dicta in dicta is misplaced. Shortly after the quoted language, we announced our holding that "where the arresting officer had probable cause to believe that a traffic violation occurred or was occurring in the officer's presence[ ] and was authorized by ... law to effect a custodial arrest for the particular offence, the resulting arrest will not violate the fourth amendment." *Id.*

cers' failure to ticket him demonstrates that the stop was unconstitutional. In *Knowles,* the Supreme Court considered whether officers who had probable cause to arrest an individual for a traffic violation but instead issued a citation could conduct a search of the individual's car *without probable cause. See Knowles,* 119 S.Ct. at 486–87. Although the Supreme Court previously had held that an officer can conduct a search incident-to-arrest without probable cause, it determined that an officer who issues a citation for a traffic violation cannot conduct a search without probable cause even if the officer could have arrested the driver for the traffic violation. *See id.* at 486–87. *Knowles* has no application to the July 1 stop because (1) an officer cannot make a traffic stop without probable cause or reasonable suspicion to believe the driver committed a traffic violation, *see, e.g., Scopo,* 19 F.3d at 781; (2) Quinn and Pia had probable cause to make the stop; and (3) the government does not seek to introduce evidence found in searches conducted after the stop.

Finally, Dhinsa urges that we reject the district court's finding that Quinn and Pia observed a traffic violation because the court found that both detectives lied about certain aspects of the car stop and that Quinn lied about other matters in issue at the suppression hearing. The district court found that the detectives deliberately lied when they initially testified that Dhinsa's car was only one-half block from the residence of the man he allegedly threatened. However, the court also noted that "[t]he fact that they may have testified in a way that I don't find credible about certain matters does not necessarily mean that every aspect of their testimony is not to be believed." The court then found that the detectives' testimony concerning the traffic violation was credible especially because the detectives openly admitted that they did not stop Dhinsa because of the traffic violation. We see no clear error in this factual finding.

Because the traffic violation that Quinn and Pia observed objectively justified their stop of Dhinsa's car, *see Scopo,* 19 F.3d at 781, and there was no clear error in the district court's factual finding that the violation occurred, we reverse the order suppressing the results of the July 1 stop.

### III. The July 7, 1997, Inventory Search

■ The government argues that the district court erred on the merits by suppressing the results of the July 7 search of Dhinsa's car because it was a lawful inventory search. The government also urges that we summarily reverse the suppression order without regard to its merits because the district court made a ruling inconsistent with its findings for the sole purpose of creating a right of appellate review that would not otherwise exist.

Had the district court, consistent with its findings, denied Dhinsa's request for suppression of the fruits of the July 7 search, Dhinsa would have had no right to take an immediate cross-appeal. *See United States v. Margiotta,* 646 F.2d 729, 734 (2d Cir.1981) (citing 18 U.S.C. § 3731). However, Dhinsa will be able to appeal the adverse suppression ruling if it is relevant to any appeal he may take from his conviction. The government argues that we should summarily reverse the district court and thereby place Dhinsa in the same position that he would have been if the district court issued a ruling based on its findings.

In making this argument, the government principally relies on *United States v. Hundley,* 858 F.2d 58 (2d Cir.1988). In *Hundley,* we addressed and dismissed the government's appeal from a district court order granting a motion pursuant to 28 U.S.C. § 2255. *See id.* at 59. During plea and sentencing proceedings, the government requested that the district court enhance Hundley's sentence because he had three prior predicate convictions. *See id.* at 59–60. The district judge determined prior to Hundley's entry of a plea that one of his prior convictions was constitutionally

infirm but "declined to make the ruling at that point because he did not want to deny the Government its right to appeal." *See id.* at 60 (internal quotation marks omitted). Instead, the judge proposed to accept Hundley's guilty plea, impose a sentence that included an enhancement for the three prior convictions, and immediately entertain and grant a Section 2255 motion to reduce the sentence based on the invalidity of the prior conviction. *See id.* After protesting this procedure, Hundley pleaded guilty. *See id.* The district judge then sentenced Hundley with the enhancement and immediately granted Hundley's oral motion to reduce the sentence. *See id.* Had the district court initially declined to enhance Hundley's sentence based on the prior conviction, the government could not have appealed. *See id.* at 61. Therefore, we dismissed the government's appeal, holding that "if the Government could not have appealed directly from a sentence originally imposed without enhancement, it cannot acquire such a right by the contrivance of a staged plea and sentence ... followed by a pre-determined collateral attack." *Id.* (emphasis removed). We characterized the Section 2255 motion as "a collusive suit, arranged between the sentencing judge and the Government over the defendant's objection." *Id.*

A different scenario confronts us here. We have jurisdiction over this appeal because the district court manipulated not the procedure but the outcome. The district court did not create a right of appeal that the government otherwise would not possess because the government can appeal a pretrial suppression order. *See* 18 U.S.C. § 3731. In fact, if we lacked jurisdiction we would have to dismiss the appeal and leave intact the district court's ruling even though the ruling was inconsistent with the court's findings of fact and law. This result clearly would violate the government's right to appeal an adverse suppression ruling. We therefore distinguish this case from the collusive arrangement present in *Hundley.*

Moreover, we can affirm the district court's order upon any ground that the record demonstrates without limitation to the grounds on which the district court relied. *See Margiotta,* 646 F.2d at 734. Dhinsa suggests that we affirm the district court's order because Verma intended to conduct an investigatory search, the search he conducted did not follow departmental procedures, and the search went beyond the bounds of a proper inventory search.

We decline Dhinsa's· invitation. Notwithstanding our jurisdiction to entertain the government's appeal, considerations of prudence and respect for the appellate scheme that Congress authorized suggest that we summarily reverse the suppression order and leave for another day the merits of Dhinsa's claims. First, none of the factors that the district court identified—the anticipated length and complexity of Dhinsa's capital trial, the perceived closeness of the issue, and the government's decision to file an interlocutory appeal on the July 1 car search—justified the district court's decision to enter an order inconsistent with his findings. Quite simply, litigants have a right to expect that courts will make their rulings based on their findings, not despite them. Second, allowing Dhinsa to question the district court's findings in an interlocutory appeal would undermine a carefully designed statutory scheme. Under certain circumstances, the government has the right to appeal from a suppression order, but Congress has not seen fit to give defendants a corollary right to appeal from the denial of a suppression order. *See* 18 U.S.C. § 3731. However, Dhinsa can appeal his conviction, and he can challenge the district court's ruling at that time. On the other hand, the government will have no right to appeal Dhinsa's acquittal on certain counts, *see United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), and thus only can challenge the suppression ruling in an interlocutory appeal. This appellate scheme protects the defendant against violation of his rights under the

Double Jeopardy Clause, *see id.*, and guarantees him a right of appeal from a final judgment while allowing the government to obtain interlocutory review of suppression orders, *see* 18 U.S.C. § 3731. We best serve Congressional intent and the strong policy against interlocutory appeals in criminal cases, *see Flanagan v. United States*, 465 U.S. 259, 264, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), by summarily reversing the district court's order because it directly contradicts its findings of fact and conclusions of law. The government concedes, and we agree, that Dhinsa may raise the admission of the fruits of the July 7 search in a post-trial appeal.

## CONCLUSION

For the reasons discussed, the district court's order is reversed.