**UNITED STATES of America,
Appellant,**

v.

**Walter HARRELL and Lawrence
Dunham, Defendants–
Appellees.**

**Docket No. 00–1772.**

United States Court of Appeals,
Second Circuit.

Argued May 3, 2001.

Decided Oct. 12, 2001.

without regard to the existence of the revenue rule.

Bret A. Puscheck, Assistant United States Attorney for the Western District of New York (Denise E. O'Donnell, United States Attorney for the Western District of New York, of counsel), for Appellant.

Scott M. Green, Rochester, NY, for Defendant–Appellee Walter Harrell.

William Clauss, Federal Public Defender's Office, Rochester, New York (Jay S. Ovsiovitch, of counsel), for Defendant–Appellee Lawrence Dunham.

Before: MESKILL, KEARSE, and McLAUGHLIN, Circuit Judges.

## BACKGROUND

McLAUGHLIN, Circuit Judge:

In this appeal we are called upon to review police conduct at the dimly-lit intersection of common sense and Fourth Amendment jurisprudence.

An anonymous tipster called 911 to complain that men with guns were in a certain car (perfectly described) on Plymouth Avenue and that the men had taken a shot at the tipster a week earlier. Police officers driving on a street near Plymouth Avenue spotted the car on the road and two men in it. The car's windows were heavily tinted. Having stopped the car, they searched it and found drugs and weapons. The defendants sought to suppress the evidence under the Fourth Amendment. Did the police act properly?

In December 1999, as a result of the encounter described above, a grand jury sitting in the Western District of New York returned a six count indictment charging each defendant with possession of firearms and ammunition, in violation of 18 U.S.C. §§ 2, 922(g)(1) and 924(a)(2), possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c)(2), possession with intent to distribute a mixture containing cocaine base (crack cocaine), in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1), and possession of marijuana, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 844(a). Dunham, the driver, is charged with an

additional count of possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). Harrell was a passenger in the car.

The case was referred to Magistrate Judge William G. Bauer for pretrial proceedings. Harrell filed a motion to suppress statements he made to the Rochester City Police after his arrest. Dunham also filed a motion to suppress physical evidence—the firearms, ammunition and drugs—seized from his car by the Rochester City Police on the night of his arrest.

Both Harrell and Dunham argued that the stop of Dunham's car was unlawful under the Fourth Amendment because the police lacked reasonable suspicion that the defendants were engaged in criminal activity. Specifically, they contended that the police failed to corroborate independently the information provided to a 911 operator by an anonymous tipster. Additionally, Harrell argued that even if the initial stop was justified, the police officers' continued detention of him after the stop resulted in an unlawful arrest because the police lacked probable cause to believe he had committed a crime.

A suppression hearing was held on Harrell's motion. (Because Dunham filed his motion after the hearing on Harrell's motion, he agreed to forgo a hearing and to rely on the evidence admitted at Harrell's suppression hearing.) Below is a summary of the pertinent evidence adduced at the suppression hearing, which included tape recordings of a 911 telephone call received by the Rochester Office of Emergency Communications (the "OEC") and the police dispatch that followed shortly thereafter. There was also testimony from Rochester City Police Officer Joseph Briganti and Sergeant Efrin Gonzalez.

## The Call

In early August 1999, the OEC received a 911 call from an unidentified male who stated "sir, there's a four-door Honda Accord with South Carolina plates [that] keeps following me with a gun." He described the color of the car as "brownish" and stated that he had "just last seen [the car] on Plymouth Avenue." He then stated, "I'll guarantee you there's guns in the car."

Under questioning by the 911 operator, the tipster repeated his assertion that the occupants of the car "got guns" and further stated that they shot at him "like a week ago, but now I'm calling 911 'cause I'm tired of running." The tipster then stated "I gotta go" and hung up the phone without identifying himself. Neither did he provide the location from which he called.

The police traced the phone call to a public payphone at 313 Genesee Street in downtown Rochester. Soon thereafter, a police dispatch was broadcast stating "there's a suspicious condition, 313 Genesee Street.... We have a male calling, states that people in a four-door brown Accord with South Carolina plates were driving around and threatening him. He said he [sic] had guns and then he hung up."

## The Response

Rochester City Police Officer Joseph Briganti testified that he and his partner, Officer Bob Hill, received the radio dispatch while heading in the direction of Genesee Street. Within a minute of receiving the dispatch, Officer Briganti spotted a Brown Honda Accord with South Carolina license plates heading towards his patrol car. As the car passed by, he saw two individuals in the front seat, but could not determine whether anyone else was in the car because all four side windows and the back window of the car were tinted.

Officer Briganti made a U-turn and followed the car. After following the car for three to four blocks, the officers turned on their emergency lights. Dunham pulled the car over and stopped.

### The Stop

As the police officers pulled behind Dunham's car, they called for backup. Soon thereafter, a separate patrol car was dispatched to 313 Genesee Street to locate the tipster, but he had already left the phone booth and has never been identified.

Officers Briganti and Hill left their patrol car and approached the Honda. Because the car's rear windows were tinted, Officer Briganti, with his gun drawn at his side, opened its rear passenger door to see if anyone was in the back seat. Only Dunham (the driver) and Harrell were in the car. Officer Hill asked Dunham for his license and registration. He then asked him to get out of the car. As Officer Hill asked Dunham to place his hands on the car, Dunham fled. Officer Hill chased and eventually caught Dunham, and arrested him soon thereafter.

While Officer Hill chased Dunham, Officer Briganti asked Harrell to get out of the car. He then performed a pat and frisk on Harrell, but found no weapons. Next, Officer Briganti led Harrell to his patrol car and asked him to remain in the back seat.

### The Search

Thereafter, Officer Briganti conducted a search of the grab areas of Dunham's car. In its glove box he found two handguns. He then called police dispatch for a technician to inspect the handguns. Next, Officer Briganti asked Harrell to step out of the patrol car, handcuffed him and placed him under arrest. After the technician removed the handguns from the glove box, a more extensive search thereof revealed ammunition, 37 baggies of crack cocaine, and marijuana. A later search of the remainder of the car turned up additional rounds of ammunition.

### The Statements

After Harrell's arrest, while he was being transported by another Rochester City Police officer to the Rochester Public Safety Building (the "Public Safety Building"), Harrell made a statement to the officer. Upon his arrival at the Public Safety Building, Harrell was interviewed again, this time by Sergeant Gonzalez-one of the officers who had arrived at the scene after Officers Briganti and Hill had called for help. Gonzalez read Harrell his rights and proceeded to ask him about the stop. Harrell provided limited information but offered to tell Sergeant Gonzalez "everything you want to know about the guns" and about Dunham in exchange for "a deal." Sergeant Gonzalez demurred and no deal was ever struck. Eventually, the interview terminated when Harrell stated that he wished to speak to a lawyer.

### The Report & Recommendation

In August 2000, Magistrate Judge Bauer issued an unpublished Report and Recommendation (the "Report & Recommendation"). He concluded that the motions to suppress should be denied on grounds "based on the totality of circumstances presented on the record." More specifically, he believed that the independent corroboration by Officers Briganti and Hill of the information provided by the anonymous tipster "provided a sufficient basis" for the officers to conduct a stop and that "[t]he circumstances that developed immediately thereafter provided a lawful basis to search the vehicle...." He also concluded that Officer Briganti's "detention of Harrell was for investigative purposes and did not ripen into arrest until after the guns were found and Harrell was handcuffed."

After reviewing the record *de novo*, the district court declined to adopt the Report & Recommendation and instead granted appellees' motions to suppress. Specifically, the district court held that "the [anonymous] tip even as corroborated by the police can not form the basis for a lawful *Terry* stop."

Thereafter, the government filed a motion for reconsideration arguing that the police officers' observation of violations of the New York State Vehicle and Traffic Law (the "Vehicle & Traffic Law") with respect to the car's tinted windows and broken brake light provided sufficient justification for the stop. The district court denied the motion.

The government now appeals from the district court's order suppressing the evidence, pursuant to 18 U.S.C. § 3731, claiming that the traffic stop was lawful.

## DISCUSSION

█ When we examine a ruling on a motion to suppress, we review the district court's factual findings for clear error and its conclusions of law *de novo*. *United States v. Bold*, 19 F.3d 99, 102 (2d Cir. 1994). The evidence must be viewed in the light most favorable to the prevailing party-here, Harrell and Dunham. *See, e.g., United States v. Jackson*, 652 F.2d 244, 246 (2d Cir.1981); *see also United States v. De la Cruz–Tapia*, 162 F.3d 1275, 1277 (10th Cir.1998).

● **The Initial Stop**

The central thrust of the government's case is that the traffic stop was lawful, based on Officer Briganti's observation that Dunham's car violated §§ 375(12–a)(b) [1] and (2)(a) [2] of the Vehicle & Traffic Law. Harrell and Dunham counter: (1) the government waived this argument by fail-

---

1. Section 375(12–a)(b) states:

   No person shall operate any motor vehicle upon any public highway, road or street:
   . . . .
   (2) the sidewings or side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent; or
   (3) if it is classified as a station wagon, sedan, hardtop, coupe, hatchback or convertible and any rear side window has a light transmittance of less than seventy percent; or
   (4) the rear window of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent. A rear window may have a light transmittance of less than seventy percent if the vehicle is equipped with side mirrors on both sides of the vehicle so adjusted that the driver thereof shall have a clear and full view of the road and condition of traffic behind such vehicle.
   N.Y. Veh. & Traf. Law § 375(12–a)(b) (McKinney Supp.2001)

2. New York State Vehicle and Traffic Law § 375(2)(a) provides:

   Every motor vehicle except a motorcycle, driven upon a public highway during the period from one-half hour after sunset to one-half hour before sunrise or at any other time when windshield wipers are in use, as a result of rain, sleet, snow, hail or other unfavorable atmospheric condition, and at such other times as visibility for a distance of one thousand feet ahead of such motor vehicle is not clear, shall display:
   (1) at least two lighted head lamps on the front, one on each side, having light sources of equal power;
   (2) if manufactured prior to January first, nineteen hundred fifty-two, at least one lighted lamp on the rear which shall display a red light visible from the rear for a distance of at least five hundred feet;
   (3) if manufactured on or after January first, nineteen hundred fifty-two, at least two lighted lamps on the rear, one on each side, which lamps shall display a red light visible from the rear for a distance of at least one thousand feet.
   N.Y. Veh. & Traf. Law § 375(2)(a) (McKinney Supp.2001)

146

ing to raise it adequately in the proceedings below; and (2) even if the government did not waive this argument, the record below fails to establish that the car violated the Vehicle & Traffic Law.

As to their assertion of waiver, defendants contend that, although the government did refer generally to the traffic violations in its various submissions to the Magistrate Judge and the district court, all such references were merely "boilerplate" and thus "insufficient to preserve the issue for appeal" under *United States v. Griffiths,* 47 F.3d 74 (2d Cir.1995). The government concedes, as it must, that it failed to cite the specific cases upon which it principally relies in this appeal until its motion for reconsideration. It emphasizes nonetheless, that from the time of the suppression hearing until today it has clearly contended that the traffic violations were among the several factors that justify the traffic stop. Thus, the government contends that it did not waive its argument that the traffic violations were enough to justify the stop. We agree with the government.

■ An issue is reviewable on appeal only if it was "pressed or passed upon below." *United States v. Williams,* 504 U.S. 36, 41, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (internal quotation marks and citation omitted); *United States v. Braunig,* 553 F.2d 777, 780 (2d Cir.1977) ("[W]here a party has shifted his position on appeal and advances arguments available but not pressed below ... and where that party has had ample opportunity to make the point in the trial court in a timely manner ... waiver will bar raising the issue on appeal."). A claim is "pressed or passed upon" when it fairly appears in the record as having been raised or decided. James Wm. Moore, *et al.,* 19 *Moore's Federal Practice* § 205.05[1] (3d ed.2000).

In *Griffiths,* the district court had suppressed evidence seized from the defendant. The government argued on appeal that the search of the defendant's duffel bag was justified as a "search incident to arrest." This Court, however, rejected the government's argument, without passing upon it, on the ground that "the government failed to pursue it below." *Id.* at 77.

In reaching that determination, we noted that in its submissions to the Magistrate Judge and the district court, the government merely incanted the phrase "search incident to arrest" twice, without offering any argument or explanation of the point, and, indeed, then proceeded to argue a different and wholly inconsistent theory—that the defendant was never arrested, but was merely detained pending verification of his immigration status. *Id.* We also found it significant that "neither the Magistrate Judge nor the district court made any reference to the 'search incident to arrest' theory in ruling on [defendant's] suppression motion." *Id.* Thus, we concluded that "merely typing out the words 'search incident to arrest' at the district court level was insufficient to preserve the issue for appeal." *Id.*

■ The facts of this case are readily distinguishable from *Griffiths.* First, during the suppression hearing, there was extensive evidence about the traffic violations. Officer Briganti testified on direct examination that he and Officer Hill could not determine whether there were more than two people in the car because the car's side and rear windows were "tinted." On cross-examination, Officer Briganti testified that he did not observe any "unusual driving" or violations of the Vehicle & Traffic Law as he passed by and later followed the car.

On re-direct examination, however, Officer Briganti's testimony was rehabilitated. He testified that he observed that the car's

windows were tinted in violation of the Vehicle & Traffic Law and, additionally, that the car's brake light "constantly stayed on" in violation of the Vehicle & Traffic Law. He added that he and Officer Hill "could have written [but did not write] a ticket on the car" for these violations. Finally, on re-cross examination, Officer Briganti agreed that "the tinting and the brake light really played no part in [his] following the vehicle, assessment of what was going on, search of the vehicle." This extensive testimony belies defendants' argument that the issue of the traffic violations was not raised before the Magistrate Judge or district court.

Second, unlike its conduct in *Griffiths,* the government herein referred to the traffic violations in each of its subsequent submissions to the Magistrate Judge and the district court below. Additionally, the issue of whether the traffic violations justified the stop was raised by Dunham's trial attorney in the affidavit he submitted in support of Dunham's motion to suppress. Affidavit of Anthony F. Leonardo, Jr., sworn to on April 21, 2000 (stating that Officer Briganti, in his testimony at the suppression hearing, "attempted to justify the stop by testifying that the car had excessive window tinting and a malfunctioning brake light .... [but] conceded that this played no part in stopping the vehicle.").

A third factor distinguishing this case from *Griffiths* is that the government's principal theory below—that under the "totality of the circumstances" including, but not limited to, the traffic violations, the stop was justified—is not inconsistent with the theory it presents on this appeal. A party's proffer below of a given factor as part of the "totality of the circumstances" that justifies a stop does not waive its right to argue on appeal that the result it advocates is justified by that factor alone.

Finally, and most significantly, both the Magistrate Judge and the district court expressly considered the traffic violations in ruling on the suppression motions. Indeed, in its *de novo* review of the Report & Recommendation, the district court emphasized the significance of the traffic violations:

> Finally, Officer Briganti testified that although the vehicle's tail lights were not functioning correctly, and despite the fact that the windows were tinted too darkly under New York State law, he would not have stopped the car based on those factors.

Based on this and other aspects of Officer Briganti's testimony, the district court concluded:

> Accordingly, the record reveals that the officers did not observe any suspicious behavior which would have led them to believe that the defendants were engaged in criminal activity.

In light of the forgoing, we find that *Griffiths* does not support defendants' waiver theory.

Defendants also maintain that the district court, in its consideration of the government's motion for reconsideration, offhandedly dismissed the government's argument that the traffic violations justified the stop as a "new theor[y]." We reject this reading of the record for two reasons. First, the above-quoted passage from the district court's decision on the suppression motion belies defendants-appellees' assertion. Second, the district court did not mention the traffic violations in its denial of the government's motion for reconsideration. Rather, it referred to the government's "new theories" immediately after noting that "the government's ... new statistical evidence of the high crime in the area" of the arrest "existed at the time of the suppression hearing." Thus, it is far from clear that the district court believed

the government waived its argument that the traffic violations justified the stop.

In sum, we are persuaded that the issue whether the police officers' observation of the car's violations of the Vehicle & Traffic Law justified the stop was both pressed by the government and passed upon by the district court below. Accordingly, this issue is preserved for appeal to this Court. We now proceed to the merits of the government's argument.

■■■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "An ordinary traffic stop constitutes a limited seizure within the meaning of [this] Amendment[ ]." *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (citation and internal quotation marks omitted); *see also Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. 1769. Evidence seized based on an unreasonable traffic stop "is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *Scopo,* 19 F.3d at 781 (citation and internal quotation marks omitted).

■■■ In support of its argument that the traffic violations justified the stop, the government relies principally on *United States v. Dhinsa,* 171 F.3d 721 (2d Cir. 1999). In *Dhinsa,* the police officers who conducted a traffic stop testified that while tailing the defendant's car, they observed him change lanes without signaling. *Id.* at 723. As in this case, however, the police

officers conceded that their decision to stop the defendant had nothing to do with their observation of the traffic violation. *Id.* Indeed, the police officers did not issue a ticket for the offense. *Id.* The district court held that the traffic violation did not justify the stop because it "had nothing to do with the detectives' decision to stop Dhinsa." *Id.* at 725. This Court reversed, however, and held that "an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *Id.* (citing *Whren,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89).

Harrell and Dunham claim that here, unlike in *Dhinsa,* the record below does not establish that Officer Briganti observed any traffic violation. They point to Officer Briganti's testimony on cross-examination that he did not observe any traffic violations when he passed and then followed the car. There is no question that Officer Briganti vacillated on this issue: first, he testified that he could not see through the tinted windows as he drove past the car; then he testified that he did not observe any violations of the Vehicle & Traffic Law as he passed and later followed the car; and finally, he testified that the windows were in fact tinted in violation of the Vehicle & Traffic Law.

But we must assess whether there was "probable cause" to believe that a traffic violation occurred "from the standpoint of an *objectively* reasonable police officer" based on "historical facts." *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis added); *see also Dhinsa,* 171 F.3d at 725 ("*Whren* and other Fourth Amendment cases require that we judge the reasonableness of an officer's actions based on the objective circumstances surrounding her actions and not on her subjective intent.") (citations omitted). It is undisputed that Officer Briganti observed that the

car's windows were tinted as he drove by it. It is also evident from the record that his testimony in this regard was not based on a casual glance. Rather, he and Officer Hill purposefully looked into the car as they passed it to determine how many people were in the car and whether any of them had guns. Thus, despite Officer Briganti's testimony that he did not "observe" a violation, the historical facts of this case persuade us that an "objectively reasonable" police officer would have suspected the windows were tinted in violation of § 375(12–a)(b) of the Vehicle & Traffic Law.[3] Accordingly, we conclude that probable cause existed to stop the car.

The government also contends that the stop was lawful based upon the police officers' corroboration of the anonymous tip. In light of our determination that the stop was justified on other grounds, we decline to address this issue.

● **The Scope of the Stop**

Finally, the government contends that after the initial stop of Dunham's car, the police officers' conduct was reasonable under the Fourth Amendment. Among other things, it urges us to reject Harrell's contention that his statements to the police should be suppressed because they were obtained after he was "arrested" without probable cause by being placed in the back of Officer Briganti's patrol car for the duration of the search. Because the district court has not addressed these issues, we decline to consider them on this appeal. Instead, we hold only that the initial stop of the car was lawful and remand the case to the district court to determine whether: (1) the police officers' conduct in approaching the car after the stop and searching it was reasonable; and (2) Harrell's state-

ments to the police should be suppressed because his detention "ripened into an arrest" without probable cause under the Fourth Amendment.

## CONCLUSION

The decision of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

MESKILL, Circuit Judge, concurring in the result:

I concur in the result reached in this case but write separately to express my view that the police officers had sufficient corroboration of the anonymous tip to justify the *Terry* stop of the vehicle. I would not reach the issue of government waiver.

I would vacate the suppression order on the ground that, under the circumstances of this case, the anonymous tip possessed sufficient indicia of reliability to justify a *Terry* stop. This is the argument that the government pressed below, the Magistrate Judge embraced and the district court rejected. I believe the district court erred.

In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Supreme Court faced the issue "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." *Id.* at 268, 120 S.Ct. 1375. A unanimous Court held that, under the facts presented, it was not. In that case, the police received an anonymous tip that a young, black man wearing a plaid shirt, standing at a certain bus stop, was carrying a weapon. The tipster did not provide any basis for his claim. The police did not

---

**3.** It is unclear from the record whether Officer Briganti noticed that the car's brake lights violated the Vehicle & Traffic Law *before* he stopped the car. Because we find that his

observation of the tinted windows justified the stop under *Dhinsa,* we need not reach this issue.

trace or record the call. Upon approaching the bus stop, the police spotted three young black men, one of whom was wearing a plaid shirt. They approached the suspect, frisked him and found a handgun. *Id.* At trial, the defendant moved to suppress the gun on the grounds that the protective search violated the Fourth Amendment.

The Supreme Court held that "[t]he anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271, 120 S.Ct. 1375. The caller "neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* The Court held that where the anonymous tip is the sole basis for a *Terry* stop, the tip must not only be reliable in identifying the suspect, but also "in its assertion of illegality." *Id.* at 272, 120 S.Ct. 1375. The Court concluded that the anonymous tip in that case did not provide sufficient indicia of reliability with respect to J.L.'s criminal activity. *Id.* at 271, 120 S.Ct. 1375.

I believe that *Harrell* is distinguishable from *J.L.* in at least two respects. First, the anonymous tip in this case provided indicia of reliability that the Supreme Court expressly found absent in *J.L.* Second, the conduct reported by the anonymous tipster in this case constituted a present danger to the caller and the community at large.

### A. *Indicia of Reliability*

This case presents at least two indications that the anonymous tip was reliable that were not present in *J.L.* First, in this case, the police traced and recorded the anonymous call. The Supreme Court noted in *J.L.* that "[s]o far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant." 529 U.S. at 268, 120 S.Ct. 1375. In concurrence, Justice Kennedy, joined by Chief Justice Rehnquist, recognized that "the ability of the police to [record telephone tips and] trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips." *Id.* at 276, 120 S.Ct. 1375 (Kennedy, *J.*, concurring). Although in this case, the ability of the police to record and trace the call did not result in the identification of the caller, it did reveal the location of the call (in close proximity to the alleged illegal activity and the eventual discovery of the suspects) and allow the district court to review the tone and substance of the call.

Second, in *J.L.*, the Supreme Court expressed concern that the anonymous tipster did not "explain[ ] how he knew about the gun." *Id.* at 271, 120 S.Ct. 1375. Here, the caller reported that he knew about the criminal activity because the suspects waived guns at him, were following him through the neighborhood, and had shot at him a week earlier. I believe that this is a sufficient explanation of the basis for the caller's knowledge of criminal activity. Although police never identified the caller, an eyewitness account of ongoing criminal activity is a superior indication of reliability than a blanket allegation (as in *J.L.*) that someone, somewhere is carrying a concealed weapon.

### B. *Present Danger*

In *United States v. Bold*, 19 F.3d 99 (2d Cir.1994), we articulated an exception to the requirement of sufficient indicia of reliability in cases where the tip involved the possession or use of guns. In distinguishing guns from drugs, we noted that:

> Th[e] element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any

doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in "controlled buys." Where guns are involved, however, there is the risk that an attempt to "wait out" the suspect might have fatal consequences. *Id.* at 104 (quoting *United States v. Clipper*, 973 F.2d 944, 951 (D.C.Cir.1992)) (alteration in *Bold* ). Thus, we signed on to the so-called "firearm exception" to the reasonable suspicion requirement. *See, e. g., Clipper*, 973 F.2d at 949.

In *J.L.*, the Supreme Court rejected the firearm exception, fearing that such an exception would "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful *carriage of a gun.*" 529 U.S. at 272, 120 S.Ct. 1375 (emphasis added). The Court also reasoned, rejecting the distinction advanced in *Bold,* that such an exception could too easily be stretched to cover narcotics suspects. *J.L.*, therefore, expressly overrules *Bold* to the extent that this Court endorsed a blanket exception to the indicia of reliability requirement where the possession of firearms is alleged. The holding, however, does not abrogate *Bold* with respect to anonymous tips involving present activity or "imminent danger." In *J.L.*, the Court refused to speculate "about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." 529 U.S. at 273–74, 120 S.Ct. 1375 (using example of possession of a bomb). In cases such as these, the requirement of indicia of reliability may be reduced or eliminated in order to serve important governmental and law enforcement interests. Here, the anonymous caller reported ongoing criminal activity that threatened his life and perhaps the lives of others in the community. In my view, this fact alone distinguishes the present case from the situation in *J.L.* Coupled with the additional indicia of reliability discussed above, I believe the district court erred in finding that the officers did not have sufficient cause to pull over the defendants' vehicle.

I would vacate the suppression order on that basis and not reach the closer question of government waiver.