**UNITED STATES of America,**

v.

**James JENKINS and Derrick Luther, a/k/a "Derrick L. Hall," Defendants.**

**No. 04 Cr. 179(DC).**

United States District Court, S.D. New York.

July 8, 2004.

David N. Kelley, United States Attorney for the Southern District of New York, by John J. O'Donnell, and Glenn Colton, Assistant United States Attorneys, New York, NY, for Plaintiff.

Leonard F. Joy, The Legal Aid Society, by Steven M. Statsinger, and Richard E. Signorelli, New York, NY, for Defendants.

## MEMORANDUM DECISION

CHIN, District Judge.

On January 18, 2004, at approximately 11:30 p.m., defendants James Jenkins and Derrick Luther were passengers in a sports utility vehicle (the "SUV") in the Bronx. Police officers in an unmarked car stopped the SUV. Two hand guns were found. Jenkins and Luther each made statements admitting responsibility for one of the weapons. Both had previously been convicted of a felony, and they were indicted in this case for unlawful possession of a weapon.

Jenkins and Luther move to suppress the guns and their statements. An evidentiary hearing was held on June 15, 2004. For the reasons that follow, the motions are denied. My findings of fact and conclusions of law follow.

## STATEMENT OF THE CASE

### A. The Facts

On the evening of January 18, 2004, Jenkins and Luther were riding in the SUV, a 2000 bluish-grey Ford Expedition, in the Bronx. (Tr. 6, 8, 17, 93–94, 133, 140; Luther Exs. A1–A9).[1] Three others were in the SUV as well: the driver, Keith Hazel; the owner, Rodney Hall; and a

---

1. References to "Tr." are to the pages of the transcript of the hearing held on June 15, 2004. References to "Ex." are to exhibits received in evidence at the hearing.

woman. (Tr. 15, 17, 101). Hall and Luther are brothers. (*Id.* 132).

New York City police officers Owens and Lynch and sergeant Patelli were in plain clothes riding in an unmarked police vehicle. (*Id.* 6–7). Owens was driving. (*Id.* 7). At approximately 11:30 p.m., as the officers were proceeding northbound on Valentine Avenue, a two-way street, he saw the SUV coming toward him headed southbound on Valentine, in the vicinity of 182nd Street. (*Id.* 7–8). The SUV had no front plate, and Owens took note of that fact. (*Id.* 8).

The front windshield of the SUV was not tinted, except for a six-inch strip across the top. The SUV had three side windows. The driver's side window was not tinted, but the middle and rear side windows were fully tinted. The rear windshield was fully tinted as well. The tinting in the middle and rear side windows and in the rear windshield was so dark that the officers could not see inside the vehicle through those windows. (Luther Exs. A1–A9; Tr. 93–94). The SUV also had side rearview mirrors on both the driver's side and the passenger's side. (*See* Tr. 41; Luther Exs. A2, A3).

As the SUV passed, Owens and Lynch saw that at least some of the SUV's windows were tinted.[2] (Tr. 8, 14, 99, 109). Owens looked in his sideview mirror, and he was unable to see a rear license plate. (*See id.* 8, 14, 45). Lynch also could not see a rear license plate. (*Id.* 99, 109). In

fact, the SUV had a rear temporary Delaware plate (*id.* 136), but the temporary plate was extremely difficult to read. (*See* Luther Exs. A1, A2; GX 6).[3] The rear license plate was illuminated only by two small yellow lights that did not provide much illumination. (*Id.* 94). A reasonable police officer seeing the temporary plate at night from a distance as the SUV was moving would have had great difficulty determining that it was any kind of legitimate license plate, much less a temporary Delaware plate.

Owens decided to stop the SUV. (*Id.* 14). He made a broken u-turn, proceeded southbound on Valentine Avenue, caught up to the SUV, and pulled it over. (*Id.* 13–14). Only "[s]econds" elapsed from the moment Owens first noticed the SUV until he stopped it. (*Id.* 35).

Owens exited the police vehicle and approached the SUV, on the driver's side. His focus was on the driver of the SUV. As he walked toward the SUV, because of the tinted windows, he could not see how many people were in the SUV. He saw that the driver's window was down a bit; it came down further as he got closer. (*Id.* 14–16).

In the meantime, Lynch and Patelli had exited the police vehicle as well. Lynch approached the SUV on the driver's side, behind Owens. Patelli approached on the passenger's side. (*Id.* 16, 100). Lynch also could not see inside the SUV, because of the heavily tinted rear windows. Lynch

---

2. Owens and Lynch could not have seen tinting in the front windshield and the driver's side window, for they were not tinted (except for the top six inches of the front windshield). (*See* Tr. 10). Nor am I persuaded that Owens and Lynch even believed that these windows were tinted.

3. The temporary Delaware plate is shown in Luther Exs. A1 and A2, which are photographs taken approximately three days after the stop. (Tr. 141–42). The photographs ac-

curately depict the temporary Delaware plate that was on the rear of the SUV on the evening of January 18, 2004. (*Id.* 142). The temporary plate was a paper plate with black letters and numbers on a white background. (*Id.* 57, 113). The photographs were taken in broad daylight from just a few yards away, and yet the temporary plate is virtually impossible to read in the photographs. (Luther Exs. A1, A2).

noticed that there was a rear license plate, but he did not look at it closely and did not determine whether it was valid. (*Id.* 100–01). He did notice letters and numbers and saw that it was a temporary, out-of-state plate. He did not realize at that point that it was a Delaware plate. (*Id.* 112).

As Owens started to speak to the driver, Keith Hazel, he noticed an odor of marijuana coming from the now-opened driver's window of the SUV. Owens asked Hazel "who was smoking marijuana," and Hazel responded that he did not smoke marijuana. (*Id.* 18; *see also id.* 102). Owens then asked Hazel for his driver's license and the paperwork for the SUV. Hazel replied that he did not have a license. (*Id.* 18). Eventually, the officers realized that there were four other individuals in the SUV, including Luther, Jenkins, and the owner of the SUV, Hall. All five occupants were asked to exit the SUV. The officers recovered two weapons, a .380 caliber hand gun and a .22 caliber revolver. Jenkins and Luther made incriminating statements, both orally and eventually in writing. Jenkins admitted that the .380 was his and Luther admitted that the .22 was his. (*Id.* 17–25, 28, 31–33, 101–06; Gov't Exs. 1, 2, 4, 5).

**B. *The Officers' Stated Reasons for Stopping the SUV***

Owens testified that he made the decision to stop the SUV because he observed that it had excessively (and illegally) tinted windows and no license plates, front or rear. (Tr. 8, 14, 39–40, 45, 48). Lynch testified that when he first saw the SUV he thought it had illegally tinted windows and no rear plate; he did not notice whether the SUV had a front plate. (*Id.* 99–100).

In fact, as the Government now essentially concedes, the SUV did not have illegally tinted windows. The front windshield was tinted only to the extent of a six-inch border running across the top, which is permitted under New York law, and the driver's side window was not tinted at all. *See* N.Y. Veh. & Traf. Law §§ 375(12–a)(b)(1), (2) (McKinney Supp. 2004). The center and rear side windows and the rear windshield were tinted, but this tinting was permitted under New York law as well because the SUV had side mirrors. *See id.* § 375(12–a)(b)(4).

Likewise, the Government now concedes that the SUV had a temporary Delaware plate in the rear. Under New York law, in certain situations, only a rear plate is required. Here, as the SUV was registered in Delaware, only a rear plate was required in Delaware, and the dealer in Delaware issued Hall (the owner of the SUV) only one temporary plate, the SUV was not required to have a front plate. (Tr. 139). *See* N.Y. Veh. & Traf. Law §§ 402(1), (5) (McKinney Supp.2004).

Hence, the traffic violations that the officers testified they thought they saw did not actually exist. Indeed, both officers testified that they realized, later in the evening of January 18, 2004 or early in the morning of January 19, 2004, after the SUV was brought back to the police precinct, that the front windshield and driver's side window were not illegally tinted and that there was a rear temporary Delaware plate. (Tr. 40–41, 48–49, 55, 57, 62, 112–14).

**C. *Prior Proceedings***

On February 24, 2004, Jenkins and Luther were indicted in this case on one count each of unlawful possession of a firearm after having been convicted of a felony. These suppression motions followed. The Court conducted an evidentiary hearing on June 15, 2004. Owens, Lynch, and Hall testified. The SUV was

produced for inspection by the Court, in the street outside the Courthouse (both in the sunlight and in the shade) as well as in the garage inside the Courthouse (where the lighting conditions were closer to what they were at 11:30 p.m. at night on January 18, 2004 on Valentine Avenue in the Bronx).

At the conclusion of the hearing, the Court reserved decision. The parties thereafter submitted post-hearing papers.

## DISCUSSION

### A. Applicable Law

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend IV. The stop of an automobile, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Accordingly, "such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994). Where the stop leads to an arrest, a two-step inquiry is required: whether the stop was supported by "reasonable suspicion," and if so, whether the arrest was supported by probable cause. *See United States v. Perea*, 986 F.2d 633, 644 (2d Cir.1993) ("an encounter that began as a permissible *Terry* stop may have ripened into an arrest, which must be supported by probable cause").[4]

Police officers may make a "brief, investigatory stop" when they have a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Although "reasonable suspicion" is a "less demanding standard" than probable cause, "at least a minimum level of objective justification" is required, and the officers "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id.* at 123–24, 120 S.Ct. 673 (*quoting Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Whether police officers had a reasonable suspicion that criminal activity was afoot is determined by examining the "totality of the circumstances." *Diamondstone v. Macaluso*, 148 F.3d 113, 124 (2d Cir.1998).

"Probable cause arises when the police reasonably believe that an offense has been or is being committed." *Scopo*, 19 F.3d at 781 (internal quotations and citations omitted). Probable cause and reasonable suspicion to stop and arrest a driver of a vehicle exist "[w]hen an officer observes a traffic offense—however minor." *Id.* at 782 (internal quotations and citations omitted). Thus, courts have found that a violation of New York State's Vehicle and Traffic Law prohibiting the operation of vehicles with excessively tinted windows provides the police with probable cause or reasonable suspicion to stop a car. *See Woods v. Candela*, 921 F.Supp. 1140, 1144–45 (S.D.N.Y.1996) (finding that defendant was properly stopped for excessively tinted windows in violation of New York law); *United States v. Barber*, 839 F.Supp. 193, 200 (W.D.N.Y.1993) (finding that excessively tinted windows provide

---

4. Defendants argue that even the stop must be supported by probable cause, citing *Whren*, 517 U.S. at 810, 116 S.Ct. 1769 ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"). *Compare Scopo*, 19 F.3d at 781. Even assuming the higher probable cause standard applies to the stop of a motor vehicle, my conclusions would be the same.

"probable cause to believe that a traffic infraction was occurring, and to justify [the police] in stopping the car"). Likewise, police officers may stop a vehicle violating the provisions of the Vehicle and Traffic Law governing license plates. *See People v. Weinert,* 178 Misc.2d 675, 683 N.Y.S.2d 690, 693 (2d Dep't 1998) ("Based upon the arresting police officer's observations of defendant operating a motor vehicle with improper license plates, as well as [other factors], ... the stop and seizure was not contrary to the state and federal constitutions."). In addition, under New York law, police officers may arrest a person for a traffic violation committed in their presence. *See Scopo,* 19 F.3d at 781.

The Supreme Court has held that the subjective intent of the police officers in stopping a vehicle is not a factor when determining whether probable cause existed. *See Whren,* 517 U.S. at 813, 116 S.Ct. 1769. Thus, the "actual motivations of the individual officers involved" in the stop "play no role in ordinary, probable cause Fourth Amendment analysis." *Id.* Even where the suspected traffic violation had nothing to do with the officers' actual decision to stop a vehicle—the suspected traffic violation is a pretext for stopping the vehicle to investigate some other suspected illegal activity—the Fourth Amendment is not violated. *Arkansas v. Sullivan,* 532 U.S. 769, 771–72, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001) (*per curiam*); *United States v. Harrell,* 268 F.3d 141, 148–49 (2001); *see also United States v. Dhinsa,* 171 F.3d 721, 724–25 (2d Cir.1998) ("an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance").

The key, then, is whether an " 'objectively reasonable' police officer would have suspected" a traffic violation, based on the "historical facts" and the objective circum-stances. *Harrell,* 268 F.3d at 148–49. If the officer on the scene observed facts that would objectively justify a stop for a suspected traffic violation, the stop is valid. *Dhinsa,* 171 F.3d at 725.

Finally, a traffic stop is not rendered unconstitutional merely because the officer is factually mistaken about the suspected violation. *See United States v. Dorais,* 241 F.3d 1124, 1131 (9th Cir.2001) (stop of rental car not invalid where officers acted on factually mistaken belief that car was overdue); *United States v. Bustillos–Munoz,* 235 F.3d 505, 506–07, 512 (10th Cir. 2000) (stop of truck not invalid where officer reasonably believed driver had high beams on illegally, even though it turned out officer was factually mistaken, as high beams were not on at all). As the Supreme Court has held,

> Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, ... and in those situations courts will not hold that they have violated the Constitution.

*Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Mistakes of law, however, will render a stop invalid. *See, e.g., United States v. Miguel,* 368 F.3d 1150, 1153 (9th Cir.2004) "[I]f an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment." (*quoting United States v. Twilley,* 222 F.3d 1092, 1096 (9th Cir.2000)); *United States v. Chanthasouxat,* 342 F.3d 1271, 1276 (11th Cir.2003).

**B.  *Application***

The Government articulates two grounds to support the stop of the SUV: the purportedly illegally tinted windows and the purported absence of lawful license plates. Although it now concedes that the officers were mistaken and that it cannot prove an actual traffic violation in

either respect, the Government nevertheless argues that the officers were reasonable in their beliefs that the traffic laws had been violated. I agree in part and I disagree in part.

■ I reject the Government's reliance on the purportedly illegally tinted windows. In fact, the windows were not illegally tinted. The front windshield was not tinted, with the exception of the legally-tinted top six inches. Although the angle of the front windshield and the resulting glare could make the windshield appear to look tinted, the same could be said of virtually any vehicle, particularly at night.[5] Moreover, the driver's side window was not tinted at all. The Court's inspection of the SUV showed that one could see clearly into the vehicle when looking perpendicular from the side, opposite the driver. Finally, although the center and rear side windows and rear windshield were so darkly tinted that it was difficult to see inside, this tinting was legal, and to the extent the officers believed otherwise, their mistake was one of law, not fact. In short, I am not persuaded that officers Owens and Lynch actually observed what could reasonably and objectively be viewed as illegally tinted windows. This purported basis for the stop is rejected.

■ An objective police officer, however, would have had a reasonable basis to believe that there was a traffic violation because the SUV appeared to lack proper license plates. There was no front license plate. There was a rear temporary plate, but the plate was not clear or easily readable. The letter and numbers were small, and the plate was illuminated only by two small yellow lights that cast off little light. Even in the photographs taken of the SUV parked in broad daylight three days after

the stop, the letters and numbers in the plate are difficult to read. Under these objective circumstances, any police officer would have had great difficulty seeing and reading the rear plate as the SUV was traveling in the opposite direction at night. *See* N.Y. Veh. & Traf. Law § 402(1) (McKinney Supp.2004) ("Number plates shall be kept clean and in a condition so as to be easily readable and shall not be covered by glass or any plastic material....."). Even though it turned out that there was a temporary Delaware plate in the rear, an objective police officer would have had a reasonable basis to believe there was a traffic violation and to stop the SUV.

■ Defendants make two arguments in this respect that warrant discussion. First, they argue that the officers' testimony that they did not see a rear plate is not credible. Although the argument is not without some support, I reject it. I accept the officers' testimony to the extent that they testified that they did not observe a rear plate when they first saw the SUV. This testimony is corroborated by the objective circumstances discussed above.

Second, defendants argue that once the officers pulled up behind the SUV, they had to have seen that the SUV had a rear plate and therefore they must have realized that the SUV did not lack proper plates. Defendants point out that Lynch testified that he noticed some sort of a rear plate after he exited the officers' vehicle. Defendants argue that Owens's testimony that he did not notice the temporary rear plate at that point is not credible, for the headlights of the officers' vehicle were shining directly on the rear of the SUV as Owens approached on foot, and it is hard

---

**5.** The Vehicle and Traffic Law does not prohibit all tinting in the front windshield, but only excessive tinting—tinting that results in

"a light transmittance of less than seventy percent." N.Y. Veh. & Traf. Law § 375(12–a)(b)(1) (McKinney Supp.2004)

to imagine that he would not have taken a glance at the plate as he walked by, for that was one of the purported reasons for the stop. At that point, defendants argue, whatever reasonable suspicion might have existed dissipated, for the officers saw or should have seen that the SUV had a temporary Delaware plate affixed to its rear.

Defendants' position in this respect is supported by the Tenth Circuit's decision in *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994). There, a state trooper saw a vehicle without a front or rear license plate, but with an apparent temporary registration sticker in its rear window. *Id.* at 559–60. The trooper stopped the vehicle "for the sole purpose of ensuring the validity of the vehicle's temporary registration." *Id.* at 561. As he approached, he saw that the sticker was valid. Nonetheless, he continued to detain the vehicle and asked the driver for identification and other paperwork. The driver did not have a driver's license, and the trooper then ran a records check. Eventually, the trooper searched the vehicle and found drugs and a gun. *Id.* at 560. The Tenth Circuit held that the continued detention of the vehicle and questioning of the driver violated the Fourth Amendment. The court held that once the trooper saw that the temporary registration sticker was valid, "the purpose of the stop was satisfied," and the further detention and questioning of the driver "exceeded the scope of the stop's underlying justification." *Id.* at 561.

In the end, however, *McSwain* does not help defendants here. The Government argued in *McSwain* that the conclusion reached by the court would require police officers who stopped a vehicle to approach on foot, visually inspect, and then, if no violation were found, walk away, re-enter their police car, wave goodbye, and drive off, "leaving the stopped citizen to wonder what just occurred." *Id.* at 562 (*quoting* Government's brief). The Tenth Circuit rejected the argument, observing as follows:

> Our holding does not require such absurd conduct by police officers. As a matter of courtesy, the officer could explain to drivers in [these] circumstances the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver's license and registration.

*Id.*

This reasoning applies here. Even assuming that an objective police officer would have seen the temporary plate on the SUV as he approached on foot after the SUV had been pulled over, and even assuming that the basis for stopping the SUV dissipated as a consequence, it would have been reasonable for an objective police officer to speak to the driver to tell him he was free to go. Absent additional reasonable suspicion or probable cause, the objective police officer would not have had any reason to further detain the SUV or ask the driver for a driver's license or otherwise question him.

Here, however, there was additional probable cause—the odor of marijuana coming from the window of the SUV. Even assuming the original probable cause dissipated, once the objective police officer approached the SUV to tell the driver he was free to go, the officer would have detected the odor of marijuana. That objective fact would have given the police officer probable cause to further detain the SUV and question the driver. Moreover, the driver of the SUV admitted that he did not have a driver's license. This admission provided even more reason for the police officer to investigate further.

In sum, I conclude that in the totality of circumstances here, an objective police of-

ficer would have had a reasonable basis for stopping the SUV—it was traveling in the Bronx at night, with no front license plate, and no apparent rear license plate. Although there actually was a rear license plate, it was a temporary, out-of-state plate that was not clear and not easily readable. These specific and articulable facts would have provided an objective police officer with a reasonable basis to believe that a traffic violation was being committed, justifying the initial stop. Even assuming an objective police officer would have noticed, after the SUV was stopped, that it had a temporary, out-of-state plate and the basis for stopping the SUV therefore dissipated, the objective police officer would have been acting reasonably to approach the driver for the limited purpose of telling him he was free to go. The objective police officer then would have found probable cause to further detain the vehicle and to question the driver because of the odor of marijuana emanating from the window of the SUV. Hence, the continued detention and questioning of the occupants of the SUV was reasonable and defendants' Fourth Amendment rights were not violated.

### CONCLUSION

For the reasons set forth above, defendants' motions to suppress the guns and statements are denied.

SO ORDERED.