**UNITED STATES of America**

v.

**Brett STEWART, Defendant.**

**No. 06 Cr. 1163(AKH).**

United States District Court, S.D. New York.

June 13, 2007.

---

Peter Nicholas Tsapatsaris, Federal Defenders Of New York Inc. (NYC), New York, NY, for defendant.

David Andrew O'Neil, U.S. Attorney's Office, SDNY (St Andw's), New York, NY, for plaintiff.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

HELLERSTEIN, District Judge.

Defendant Brett Stewart was charged in a one-count indictment dated December 19, 2006 with violation of 18 U.S.C. § 922(g), which prohibits the possession of

a firearm that has been transported in interstate commerce by persons having been previously convicted of a crime punishable by a term of imprisonment that exceeds one year. On January 29, 2007, Defendant filed a motion to suppress physical evidence seized and statements elicited from him by police officers when the officers stopped the taxicab in which Defendant was riding in the early morning hours of August 29, 2006, removed him from the vehicle, and placed him under arrest. Fed.R.Crim.P. 12, 41(h). Defendant argued that the evidence was taken from him in violation of his rights under the Fourth Amendment to the United States Constitution. The Government argued that the evidence was obtained through a reasonable stop and search based on a traffic violation by the driver of the taxicab, on a general permission given by the owner of the taxicab, and by suspicious movements of the passenger, the defendant.

On March 28, 2007 I held an evidentiary hearing and heard oral argument. For the reasons set forth below, I grant Defendant's Motion to Suppress.

## I. Background—The Undisputed Facts

At approximately 3:00 a.m. on August 29, 2006, defendant Brett Stewart ("Stewart") hailed a taxicab at 900 East Tremont Avenue in the Bronx. Stewart asked the driver, Wilfredo Jimenez, Jr. ("Jimenez"), to take him to 165th Street, between Sherman and Sheridan Avenues, also in the Bronx. Tr. 85–86. En route and heading west on 165th Street, Jimenez stopped his taxi before a red light at the northeast corner of the intersection of 165th Street and Brook Avenue at approximately 3:20 a.m. Tr. 14.

At the same time, New York City police officers Robert Regnier ("Regnier") and Angel Torres ("Torres") were driving eastbound on 165th street from the opposite direction in an unmarked Chevrolet Impala. As they approached the Brook Avenue intersection, they drove toward Jimenez's taxicab very slowly, and watched Stewart, Jimenez's passenger, intently. Officers Regnier and Torres worked in the Bronx Anticrime Unit, a roving unit which assigns its officers to precincts experiencing surges in crime. Torres was driving and Regnier was sitting in the front passenger seat; both men were in plainclothes. Tr. 10, 53–60.

Regnier and Torres testified that as they drove through the intersection, they noticed that the taxicab's front wheels were extended slightly into the crosswalk. Although stopping in intersection crosswalks is common in New York City and rarely, if ever, results in a police stop or a summons, the officers testified that they considered that a violation of the traffic law had occurred. N.Y. Veh. & Traf. Law § 1172(a) (vehicle must stop before entering the crosswalk on the near side of the intersection); Tr. 33, 35, 59. The officers testified that their attention was trained upon the passenger, defendant Stewart, in the rear seat, and that Stewart seemed "very interested" in them as they slowly moved easterly, through the intersection and the red light. Tr. 15, 33, 35, 61.

Torres made a U-turn behind the taxicab. When the light turned green, Torres activated his police lights and followed the taxicab, and Jimenez, in response, pulled to the side of the road and stopped his taxicab just west of Webster Avenue on 165th Street. (Webster, Brook and Park Avenues, north-south streets, cross one another other at the intersection with 165th Street, creating a wide intersection of four principal streets.) Officers Torres and Regnier stopped behind Jimenez. Tr. 16.

Officer Torres exited from the driver's door of the patrol car and approached Jimenez, the driver. Torres asked Jime-

nez if "everything was alright," and told him that they were going to "check out" the man (Stewart) in the back seat. Tr. 87. Meanwhile, Officer Regnier exited from the front right passenger seat of the patrol car and approached the rear right side of the taxicab, where Stewart was sitting. Tr. 17. Neither Torres nor Regnier mentioned a traffic infraction. Tr. 63, 81, 87. Regnier testified that as he looked at Stewart through the rear right window, he was unable to see Stewart's right hand, and that it appeared to him that Stewart was sitting on his hand. Regnier asked Stewart to let him see his hands, and Stewart complied initially, putting both hands upon his lap, but then moved his right hand back near his right buttock, obscuring it from Regnier's view. Tr. 18. Regnier ordered Stewart to exit the vehicle, and Stewart exited, but turned himself clockwise so as to keep his right side obscured from Regnier's view. Tr. 20. Regnier ordered Stewart to place his hands on the taxicab, but Stewart did not immediately comply. Regnier then grabbed Stewart, turned his body, and forcibly placed Stewart's hands upon the trunk of the cab. Tr. 20. As Regnier was forcing Stewart in this manner, the officers reported that Stewart remarked, in substance, "Take it easy, officer; I only have a little thirty-eight." Tr. 17–20, 64.

Hearing Stewart's remark, Officer Torres joined Officer Regnier at the rear of the taxicab, and they put Stewart's hands in handcuffs and placed him under arrest. Tr. 21. Regnier reported that Stewart then informed him that his weapon was in his rear right pocket, and Regnier reached into Stewart's pocket and recovered a black pouch containing a ".25 caliber Raven Arms semiautomatic handgun." Tr. 21–23.

Jimenez testified that the taxicab displayed a decal on the smaller window above each rear passenger door, stating that the taxicab participated in the Taxi Livery Inspection Program ("TRIP"). Under TRIP, participating taxicab owners authorize New York City Police officers to conduct suspicionless stops of taxi and livery vehicles as part of a program to reduce crime directed at drivers. *See* Tr. 6; *People v. Abad,* 98 N.Y.2d 12, 744 N.Y.S.2d 353, 771 N.E.2d 235 (2002). The program requires that taxicab owners provide consent forms for signature by taxicab drivers, and also precludes officers from removing or questioning vehicle occupants absent independent grounds for detention. *Id.* at 14–15, 18, 744 N.Y.S.2d 353, 771 N.E.2d 235. In addition to the decals to be placed upon the rear passenger windows, TRIP also provides for a decal to be placed "conspicuously within the rear passenger compartment where the passenger can read it." *Id.* at 15, 744 N.Y.S.2d 353, 771 N.E.2d 235.

No testimony was presented regarding the TRIP program itself, or whether the owner of Jimenez's taxicab had enrolled, and had maintained his enrollment, in the program by signing the required registration form. Police officers Torres and Regnier did not see the decal, and did not testify that they based their stop and ensuing search on TRIP.

## II. Findings of Facts that were Disputed

Three witnesses were called at the Hearing: Officers Regnier and Torres and Jimenez, the taxicab driver. While Torres and Regnier both testified that they observed that the front wheels and front portion of the taxicab were on or over the crosswalk line(s) and, therefore, in the intersection as they passed through in the patrol car, Jimenez insisted that he had come to a full and complete stop before the intersection, and that the wheels and front end of his vehicle had not passed the lines

of the crosswalk. *Compare* Tr. 33, 35, 59 *with* 89–96. Jimenez testified that he knew this because he had noticed the red light from a distance as he approached, and that he had decelerated well before arriving at the intersection. Tr. 92.

Both officers testified that their focus was upon Stewart, seated in the rear right corner of the vehicle, the seat furthest from both the taxicab's front left wheel and the officers' vantage point as they drove through the intersection and the red light. Tr. 35, 59–62, 76. The officers testified also that they did not observe the traffic infraction until they were at least midway through the intersection and observing the vehicle from a "close[ ] ... side angle." Tr. 76. In light of this testimony, and taking notice of the fact that a stationary object may shift in one's visual perception as one moves past it—that an object abutting a straight line may appear to be over that line as an observer moves past and away from that line—I find Jimenez's testimony regarding the location of his vehicle in relation to the line to be more credible. Mr. Jimenez had been driving a taxicab for close to a decade, had no criminal record, and had never been arrested. He gave a calm, clear, and consistent account of the events of the early morning hours of August 29, 2006, and his testimony was persuasive. I find, for the purposes of Stewart's suppression motion, that Jimenez did not violate Section 1172(a) of New York Vehicle and Traffic Law.

With respect to the observable presence, or not, of TRIP decals on Jimenez's taxicab, I note that the government alerted the Court in its brief that it "has since located the car Jimenez was driving when the stop occurred. It does not bear TRIP decals, and the current owner of the car stated that he does not recall that it had such decals when he purchased it from an associate of Jimenez." Govt.'s Br. 5 n. 1. However, the Government also informed the Court that the current owner thought he purchased the car in March 2006, a date which predates August 29, 2006, the date of Stewart's seizure. Govt.'s Br. 5 n. 1.

Although I have no reason to disbelieve Jimenez's testimony that TRIP decals were affixed to the small rear passenger door windows of the taxicab, there was no proof that the decals were readily observable. On the contrary, the officers did not notice TRIP decals at any point in the evening. Nor was there proof that a decal was evident to passengers seated in the back seat of the taxicab, or that the owner or driver had signed a consent signaling participation, as required by TRIP. *See Abad,* 98 N.Y.2d at 14–15, 744 N.Y.S.2d 353, 771 N.E.2d 235.

With respect to the remainder of the relevant facts, I accept the accounts of the police officers. I find that Stewart's hands were out of Officer Regnier's view as Regnier approached the vehicle, and that Regnier reasonably was concerned about his safety. I further find that Stewart failed to comply with officer Regnier's directives, and that Regnier consequently removed Stewart from the vehicle and, when Stewart stood in a sidelong and awkward manner, that Regnier placed Stewart against the vehicle for the purpose of conducting a frisk and search for weapons, as authorized by *Terry v. Ohio,* 392 U.S. 1, 27–28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Furthermore, Stewart's unsolicited admission to Regnier that he was concealing a weapon prompted Regnier and Torres to place Stewart under arrest, at which point they recovered a loaded .25 Raven semiautomatic handgun.

### III. Discussion

#### A. *Legal Framework*

The Fourth Amendment to the United States Constitution guarantees

428

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *e.g.,* *Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. *Id.* Therefore, such stops must not be "unreasonable" under the circumstances, · as the term is defined by the caselaw. *Id.* at 810, 116 S.Ct. 1769. Automobile passengers, no less than drivers, retain the Fourth Amendment right to challenge the propriety of a traffic stop. Each individual in an automobile, including taxicab passengers, has an interest "in freedom of movement and a concomitant interest in being insulated from the fear and anxiety that frequently accompany a sudden, unexplained stop." *United States v. Woodrum,* 202 F.3d 1, 5–6; *Townes v. City of New York,* 176 F.3d 138, 144 (2d Cir.1999).

■ When a police officer validly stops a vehicle, the officer may, consistent with the Fourth Amendment and as a matter of course, order all occupants to exit the vehicle. *Maryland v. Wilson,* 519 U.S. 408, 412–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). And when an officer has a reasonable suspicion that a person may be armed and dangerous, the officer may conduct a limited search for weapons in order to ensure the safety of the officer and the general public. *Terry,* 392 U.S. at 27–28, 88 S.Ct. 1868; *cf. United States v. Paulino,* 850 F.2d 93, 94, 98 (2d Cir.1988) (protective search for weapons in vehicle justified where occupant moved "furtive[ly]" in double-parked car stopped in high-crime neighborhood and the officers could not clearly see the occupant's hands after the occupant bent over in the vehicle).

However, all depends on the initial stop of the taxicab, for if the initial stop was conducted in violation of the Fourth Amendment, all evidence gathered subsequently must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (fruit of the poisonous tree doctrine); *Townes,* 176 F.3d at 145 (same). I turn therefore to Fourth Amendment doctrine as it relates to the officers' stop of the taxicab, and whether officers Torres and Regnier had either probable cause to believe that a traffic violation had occurred, or a reasonable suspicion that it had occurred. I hold that the stop was not justified under either theory. *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740, (2002); *Whren,* 517 U.S. at 810, 116 S.Ct. 1769.

■ I hold that the government failed to establish by a preponderance of the evidence that the officers had probable cause to believe that a traffic violation had occurred. In light of the relative movements of the two vehicles, the focus of attention by the police officers on the passenger in the rear seat, and the fact that the officers did not detect an incursion into the intersection until they were even with the stopped taxicab and passing by it, an objectively reasonable police officer would not have believed that the taxicab violated New York's motor vehicle code. N.Y. Veh. & Traf. Law § 1172(a); *see Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *United States v. Martin,* 411 F.3d 998, 1001 (8th Cir. 2005); *United States v. Smart,* 393 F.3d 767, 770 (8th Cir.2005).

■ I hold also that the officers could not have had a reasonable suspicion that "criminal activity may be afoot." *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Swindle,* 407 F.3d 562, 566 (2d Cir.2005). The officers justified their stop by expressing concern that the

passenger in the back seat was watching them closely as they, in their unmarked police car and civilian clothing, drove through a red light and past the taxicab. That, in my judgment, is normal behavior for anyone in a stopped car at 3 a.m. in a crime-filled area. And, even if Stewart's interest in the officers was somewhat suspicious, this alone falls short of the particularized and objective basis, taking into account the totality of the circumstances, required to satisfy the "reasonable suspicion" standard. *Arvizu*, 534 U.S. at 273–278, 122 S.Ct. 744.

Furthermore, a traffic violation for infringing on an intersection does not qualify as "criminal activity." *See* N.Y. Veh. & Traf. Law § 225 and Practice Commentaries (prosecution of traffic infraction is performed administratively, and under a standard of proof of "clear and convincing," with only monetary penalties to be levied). Such stopping is frequent in New York City, and particularly is understandable in the context of this crime area, at 3 a.m., to be closer to street lights and the greater activity at intersections—measures of elementary safety in driving on Bronx streets. Because the alleged traffic violation was not a crime, and the activity of Jimenez and his taxicab were reasonable in the circumstances, the stop cannot be justified under a "reasonable suspicion" standard. The cases that express a standard of reasonable suspicion normally involve typical criminal activity, *See, e.g., Arvizu*, 534 U.S. at 268–73, 122 S.Ct. 744 (vehicle stops by roving border patrols investigating illegal immigration) *United States v. Singh*, 415 F.3d 288, 294–95 (2d Cir.2005) (same); *Swindle*, 407 F.3d at 564 (F.B.I. "career criminal taskforce" investigation), not traffic violations.

### B. TRIP and Passengers' Reasonable Expectation of Privacy

The Government argues that Stewart surrendered his legitimate expectation of privacy by hailing and entering a cab with TRIP decals on the rear passenger windows. Govt.'s Br. 14. The TRIP decals, titled "Public Notice," state that the "Vehicle may be stopped and visually inspected by the police at any time to ensure driver's safety." The Government argues that the TRIP decals were "prominently displayed," and "intended to capture the attention of an entering passenger." Govt.'s Br. 18.

 I do not agree. Neither of the officers recalled noticing the TRIP decals. Taxicabs approach customers from significant distances, at significant speeds, at different times of day and night, and in different neighborhoods, with different apprehensions of danger. Passengers do not have time to reflect on the decals adorning the taxicab.

There was no proof that Stewart saw the decals or otherwise surrendered his reasonable expectation of privacy given to him by state and federal law when he entered Jimenez's taxicab. Again, there was no proof that Officers Torres and Regnier were aware of, or saw, any TRIP decals. Nor was there proof that the owner of Jimenez's taxicab, or Jimenez, had enrolled in the program or, if either had enrolled, that he had maintained his enrollment. Thus, the two cases that uphold a TRIP stop do not apply. *See Woodrum*, 202 F.3d at 5 (police "aware of the decals" affixed to taxicab); *Abad*, 98 N.Y.2d at 15, 744 N.Y.S.2d 353, 771 N.E.2d 235 (officers "saw a TRIP decal on [the] vehicle" before commencing stop); *United States v. Harrell*, 268 F.3d 141, 149 n. 3 (2d Cir.2001) (justification based upon observation of traffic violation would turn upon whether the officer "noticed ... the [violation] *before* he stopped the car"). After-the-fact justifications cannot justify an unautho-

rized stop. *See Swindle*, 407 F.3d at 569; *United States v. Como*, 340 F.2d 891, 893 (2d Cir.1965).

### IV. Conclusion

For the reasons stated above, Defendant's motion is granted. The parties shall appear before me next for a pretrial conference on June 28, 2007, at 12:00 p.m.

SO ORDERED.