**UNITED STATES of America**

v.

**Brett STEWART, Defendant.**

**No. 06 Cr. 1163 (AKH).**

United States District Court,
S.D. New York.

April 1, 2009.

---

David Andrew O'Neil, U.S. Attorney's Office, SDNY, New York, NY, for United States of America.

Peter Nicholas Tsapatsaris, Federal Defenders of New York Inc., New York, NY, for Defendant.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

ALVIN K. HELLERSTEIN, District Judge:

Defendant Brett Stewart is charged with violating 18 U.S.C. § 922(g), which prohibits possession of a firearm by a convicted felon. He moved to suppress physical evidence and statements arising from the police stop of the livery cab in which he was riding on the night of his arrest. After holding an evidentiary hearing, I granted Defendant's motion by Opinion and Order dated June 13, 2007. 491 F.Supp.2d 423 (S.D.N.Y.2007). The Court of Appeals reversed, holding that I had misstated the standard that governs whether a traffic stop violates the Fourth Amendment to the United States Constitution, and remanded the case for me to "determine whether Officers Regnier and Torres had a reasonable suspicion that the livery cab driven by Jimenez committed a traffic violation." 551 F.3d 187, 193 (2d Cir.2009). I invited the parties to augment the record on the question posed by the Court of Appeals. Having reviewed the parties' submissions in light of the entire record, I hold that the officers did not have a reasonable suspicion that the livery cab committed a traffic violation. Accordingly, for the reasons described below, I again grant Defendant's motion to suppress evidence.

### I. Relevant Facts

I present here the facts relevant to the instant question, incorporating the broader factual summary of my Opinion and Order of June 13, 2007. *See Stewart*, 491 F.Supp.2d at 425–27.

On August 29, 2006, around 3:20 a.m., New York City Police Sergeant Angel Torres and Police Officer Robert Regnier were driving east on 165th Street in the Bronx in an unmarked car. Sergeant Torres was driving, and Officer Regnier was in the front passenger seat. As the officers approached a red light at the intersection of 165th Street and Brook Avenue, they saw that a black livery cab was stopped at the red light on the opposite side of the intersection, facing west on 165th Street. Wilfredo Jimenez, Jr. was driving the livery cab, and Defendant Brett Stewart, his passenger, was sitting in the backseat on the right side. Tr. 13–14, 19, 53, 69, 85–86.[1]

The officers drove slowly through the red light, crossing Brook Avenue and passing the cab on their left. Their usual practice when on patrol was to scrutinize the occupants of vehicles that they encountered. As Officer Regnier explained, "We usually drive by real s[l]ow so we can take a look at who's inside and see if anything looks out of the ordinary to us." Tr. 15; *see* Tr. 69. Accordingly, as the officers moved through the intersection, they focused on Defendant, the cab's passenger, studying his appearance and actions. Sergeant Torres testified that he "was driving maybe three, four, five miles an hour being nosy looking into the car." Tr. 60. Defendant returned the officers' attention. Sergeant Torres testified that Defendant turned his head to follow the movement of the officers' car, met Sergeant Torres' eyes, and stared at him, which led Sergeant Torres to think that Defendant was "a little nervous." Tr. 60, 77. Officer Regnier testified similarly that Defendant "kept looking at us, . . . actually turned his head, . . . [and] was very interested in what we were doing, where we were going." Tr. 15; *see* Tr. 33–35.

---

1. "Tr." refers to the transcript of the evidentiary hearing held on March 28, 2007.

In addition, the officers testified that they saw that the livery cab was protruding into the crosswalk while waiting at the red light, which is a violation of the New York Vehicle & Traffic Law.[2] Officer Regnier testified that, though he was not sure, he believed that he first noticed the violation when the officers were "probably midway through the intersection." Tr. 35. Sergeant Torres testified that he "observe[d] a livery cab parked a little bit over the white line of the crosswalk" when the officers "entered the intersection," though he also testified that, after first seeing the cab when the officers "got to the middle of the intersection," he "probably had to drive a little closer to tell from a side angle" that the wheels were in the crosswalk. Tr. 57, 76. The officers described the extent to which the cab had entered the crosswalk, which was formed by two parallel lines, as minimal. Tr. 91. Officer Regnier testified that the cab's wheels were "just over the first line. . . . I couldn't tell you exactly how many inches." Tr. 27. Sergeant Torres testified that the wheels were "a little bit pas[t]" and "actually over but not really far over" the first line, but also that Mr. Jimenez "wasn't out into the intersection but he was far enough to be in the middle of the walk." Tr. 68. Officer Regnier commented on the violation first, saying "basically that the cab's wheels were over the crosswalk and the guy in the back seat is very interested in us." Tr. 33, 35; *see* Tr. 77. Officer Regni-

er was looking across Sergeant Torres and through the police car. Tr. 33–34. He could not recall whether the police car's windows were down, though Sergeant Torres was certain that the windows were down, and testified that Officer Regnier "[a]lways has the window down" as a matter of course. Tr. 33–34, 80–81.

The officers decided to stop the cab. Officer Regnier testified, "[W]e stopped the car because of the vehicle infraction, but it was also partly because we wanted to see who was in the car and what was going on." Tr. 50. Likewise, Sergeant Torres testified that the traffic violation, when combined with Defendant's unusual behavior, convinced him that "this is a car worth stopping." Tr. 77. He explained, "[L]egally I could put him approximately over the infraction and truthfully I was interested in the way that Mr. Stewart looked at me." Tr. 72. Sergeant Torres also testified, however, that he stopped the cab out of concern for the driver, as seeing the traffic violation led him to "assume[ ] that maybe the cab driver doesn't feel comfortable staying a little farther behind where it's a dark and lonely street [at] 3:20 a.m." Tr. 59, 68–69. He admitted, however, that there was no more light in the area where a car could have stopped legally than there was just over the first line of the crosswalk. Tr. 68–69.

After stopping the livery cab, Sergeant Torres walked to its front driver's side

2. In my Opinion and Order of June 13, 2007, I found that Mr. Jimenez did not in fact violate N.Y. Veh. & Traf. Law § 1172(a), which requires vehicles approaching a stop sign to "stop before entering the crosswalk." *Stewart*, 491 F.Supp.2d at 427. I reaffirm that finding here, and further find that Mr. Jimenez did not in fact violate N.Y. Veh. & Traf. Law § 1111(d)(1), which imposes the same requirement on vehicles approaching red lights. Mr. Jimenez testified unequivocally that he came to a full stop before any part of his cab entered the crosswalk, explaining that he saw the red light and decelerated well before reaching the intersection. Tr. 88–95. Weighing the clear testimony of Mr. Jimenez, an experienced driver with no arrests or convictions, against the testimony of the officers, who were making a tricky visual determination while in a moving car and while their attention was fixed on Defendant, I found Mr. Jimenez's testimony more credible. *Stewart*, 491 F.Supp.2d at 427. I note, however, that a mistake of fact does not preclude a finding of reasonable suspicion. *E.g., Stewart*, 551 F.3d at 193.

door, while Officer Regnier walked to the rear right side door, where Defendant was sitting. Tr. 17, 62–63. Mr. Jimenez testified that Sergeant Torres asked him if "everything was all right." Tr. 87. He elaborated:

Q: Did he tell you why he had pulled over the car?

A: Only to check out the guy.

Q: He said he pulled over the [car] to check out Mr. Stewart?

A: Yes.

Q: Did he ask you anything else?

A: No. Just if I was all right.

Tr. 94. Sergeant Torres then heard Officer Regnier open Defendant's door, beginning an exchange in which Defendant stated that he had a gun, which the officers recovered. Tr. 17–23, 62–65, 74–76, 81–82. Neither officer mentioned a traffic violation during the stop. Tr. 89.

## II. Discussion

### A. Standard

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Therefore, such a stop must be "reasonable" under the circumstances. *Id.* at 810, 116 S.Ct. 1769. "Evidence seized based on an unreasonable traffic stop 'is subject to the fruit of the poisonous tree doctrine, and may be suppressed.'" *Unit-*

ed States v. Harrell, 268 F.3d 141, 148 (2d Cir.2001) (quoting *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994)); *see Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ A traffic stop is reasonable under the Fourth Amendment if the officer conducting the stop has at least a reasonable suspicion that a crime, including a minor traffic violation, has been committed. *Stewart*, 551 F.3d at 193 ("[W]e now hold unambiguously that the reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop."); *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir.2005) ("The Fourth Amendment requires that an officer making [a traffic] stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity.").[3] "The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." *United States v. Medina*, 301 F.Supp.2d 322, 328 (S.D.N.Y.2004).

■ A traffic stop may be valid even if its stated justification is pretextual. *See Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (citing *Whren*, 517 U.S. at 809, 116 S.Ct. 1769); *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir.1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."). Thus, a stop may be valid even if not motivated by a traffic violation, as long as the officer saw a violation. *Dhinsa*, 171 F.3d at 725. A stop may also be valid

---

**3.** In my Opinion and Order of June 13, 2007, I stated the Fourth Amendment question in the disjunctive: "whether officers Torres and Regnier had either probable cause to believe

that a traffic violation had occurred, or a reasonable suspicion that it had occurred." *Stewart*, 491 F.Supp.2d at 428.

even if the officer did not believe that he saw a traffic violation, as long as an objectively reasonable officer in his position would have suspected that a violation had occurred. *Harrell*, 268 F.3d at 149. Moreover, a stop may be valid even if no traffic violation actually occurred, as long as the officer reasonably suspected that the violation had occurred. *Stewart*, 551 F.3d at 193; *see United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir.2006).

### B. Analysis

■ In this case, the question is whether Sergeant Torres or Officer Regnier had a reasonable suspicion that the livery cab driven by Mr. Jimenez had violated the New York Vehicle & Traffic Law. *See Stewart*, 551 F.3d at 193. This question of reasonable suspicion has two parts: first, whether the officers in fact suspected a violation, and second, whether their suspicion was objectively reasonable. I hold that the Government has failed to prove by a preponderance of the evidence that the officers had a reasonable suspicion of a traffic violation, because (1) despite their testimony, the officers did not in fact suspect a violation, and (2) even if they did suspect a violation, their suspicion would have been objectively unreasonable.

In the typical reasonable suspicion case, "the police officer observes unusual conduct that leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The question in such a case, where "unusual conduct" forms the basis of the officer's suspicion, is whether the "common sense judgments and inferences about human behavior" made by the officer were reasonable. *See United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir.2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). However, where a traffic stop is premised on an officer's direct observation of a straightforward traffic violation (like tinted windows, a broken taillight, or protrusion into a crosswalk), what the officer observes is not unusual conduct that might hint at a violation, but the entirety of the violation itself. Few "inferences and deductions" or "commonsense conclusions," *see United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), are involved, and only one "specific and articulable fact[ ]," *see Terry*, 392 U.S. at 21, 88 S.Ct. 1868, is in issue: whether the officer believed that he directly observed a violation. *See Dhinsa*, 171 F.3d at 725 (denying suppression motion because "officers observed a traffic violation, an objective circumstance that justifies a traffic stop"); *Scopo*, 19 F.3d at 781 ("Scopo's stop was based upon a specific and articulable fact: the observed traffic violation.").

I find that Sergeant Torres and Officer Regnier did not believe, before conducting the traffic stop, that they had observed the livery cab protruding into the crosswalk. The officers were not interested in the placement of the cab with respect to the crosswalk. They were interested in the occupant of its backseat. Both officers locked their gaze onto that occupant, examining his demeanor inside the dark cab so closely as to conclude that he was nervous and that the cab was worth stopping to investigate him further. *See* Tr. 61, 77. Given their concerns about Defendant, any less rigorous an examination could have been dangerous. In addition, the officers were driving through a complex ten-way intersection that demanded the full remainder of their attention. 165th Street, a two-way, east-west street, crosses Park Avenue, Melrose Avenue (which connects via the Willis Avenue Bridge to Manhattan), Webster Avenue (a major north-south truck road), and Brook Avenue all within about 200 feet. An eastbound driver, whatever the time of day or night, must carefully cross the four avenues of poten-

tially oncoming traffic, particularly if passing through a red light.

Moreover, the officers' testimony was contradictory as to the extent of the supposed violation and the moment at which they detected it. Sergeant Torres said that the livery cab was "a little bit over the white line of the crosswalk," Tr. 57, and Officer Regnier, who was looking from the police car's front passenger seat and across Sergeant Torres, said that the livery cab's wheels were "just over the first line," Tr. 27, 30. Yet Sergeant Torres also said that the cab "was far enough to be in the middle of the walk," so far as to cause him to stress that it "wasn't out into the intersection." Tr. 68. Even if the livery cab was protruding into the crosswalk minimally by its front wheels but substantially by its front hood, as Sergeant Torres seemed to imply in his second depiction, the officers would have seen such a clear violation as they entered the intersection—not (as Officer Regnier testified) when they were "midway through the intersection," Tr. 35, and certainly not (as Sergeant Torres testified) when they drew even with the livery cab and were looking "from a side angle," Tr. 76.

After stopping the cab, the officers did not question Mr. Jimenez about any traffic violation, but asked only whether he was being bothered by Defendant, the occupant of the backseat. Tr. 89, 94. Since pretextual stops are valid, no officer is obliged to make the pretext for his stop more than pretext by pointlessly questioning the driver about it. But the fact that Sergeant Torres and Officer Regnier demonstrated no interest in the traffic violation that they claimed to have observed further supports the notion that they never suspected a violation at all, as does the fact that neither officer made any memo book entry about a traffic violation. *See* Tr. 36, 78.

I hold that the officers did not, in fact, harbor a thought about the placement of the livery cab, and, indeed, had no suspicion, reasonable or not, that it was stopped in the crosswalk. The officers stopped the cab, as Sergeant Torres told Mr. Jimenez, "[o]nly to check out the guy," Tr. 94, and neither believed at the time that they had acquired, through observation of a traffic violation, a sufficient pretextual basis on which to conduct a valid traffic stop. At the evidentiary hearing, and in retrospect, the officers may have believed that they had observed the livery cab violating the New York Vehicle & Traffic Law, which violation justified their "intrusion upon the sanctity" of Mr. Jimenez and Defendant. *See Terry*, 392 U.S. at 17, 88 S.Ct. 1868 (noting that even the briefest stop "may inflict great indignity and arouse strong resentment"). But their testimony to that effect, I find, was an after-the-fact reconstruction, something that obliging hindsight convinced them must have occurred, even though they did not hold that suspicion on the night that they stopped the cab. In other words, this is not a case of mistake of fact, but of no mistake at all.

In my Opinion and Order of June 13, 2007, I held that the officers lacked probable cause to believe that the livery cab had committed a traffic violation, because, having dedicated their attention to Defendant, and faced with a difficult visual assessment, "an objectively reasonable officer would not have believed that the taxicab violated New York's motor vehicle code." *Stewart*, 491 F.Supp.2d at 428. I could as easily have held, as I do now, that the officers lacked any such belief, reasonable or unreasonable. I reiterate, however, that even if the officers truly believed that they had observed a traffic violation, such belief would have been unreasonable under the circumstances.

The fact that an officer truly believed that he saw a violation does not necessarily make it reasonable for him to

suspect that the violation occurred. Good faith alone does not make suspicion reasonable. *See Terry,* 392 U.S. at 22, 88 S.Ct. 1868. Even if the violation that the officer claims to have seen is straightforward, a court must still assess the reasonableness of the officer's reliance on his observation, in light of any objective circumstances that might have led a reasonable officer to doubt the accuracy of what he believed he saw. *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (requiring "totality of the circumstances" analysis). Just as it is unreasonable to suspect criminal activity on the basis of faulty deductions and inarticulable facts, it is also unreasonable to suspect a traffic violation on the basis of an unreliable underlying observation. Reliability is more often the central inquiry when an officer's suspicion derives from an anonymous tip, *see, e.g., Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), but it is no less critical when that suspicion derives from direct observation.

For example, in *United States v. Jenkins,* 324 F.Supp.2d 504, 510 (S.D.N.Y. 2004), *aff'd on other grounds,* 452 F.3d 207 (2d Cir.2006), the District Court held that officers lacked reasonable suspicion to stop an SUV, despite their direct observation (later proved incorrect) that the SUV had illegally tinted windows. Although the Court found that the windows were "so darkly tinted that it was difficult to see inside," and that "the angle of the front windshield and the resulting glare could make the windshield appear to look tinted," it noted that the latter phenomenon applies to "virtually any vehicle, particularly at night," and that inspecting the SUV from an alternate angle would have revealed no tinting at all. *Id.* Accordingly, the Court held that the officers did not "actually observe[ ] what could reasonably and objectively be viewed as illegally tinted windows." *Id.* Likewise, in *Harrell,* the

Court of Appeals was persuaded that an "objectively reasonable police officer" would have suspected that a car was violating the tinted windows law largely because testimony of the observing officer "was not based on a casual glance," but on his "purposeful" efforts to see through the windows. *Harrell,* 268 F.3d at 149. A suspicion is less likely to be reasonable when the observation on which it rests, however honestly held, is frustrated by fleetingness, distractions, obstructions, or deceptive angles, glares, or shadows.

Having already held that Sergeant Torres and Officer Regnier lacked probable cause to believe that a traffic violation had been committed, *see Stewart,* 491 F.Supp.2d at 428, I now hold that—even if the officers truly believed that they had observed a violation, which they did not believe—their suspicion that a violation had been committed would have been unreasonable. The purported violation in this case was a matter of inches, observed by the officers for only a fraction of the "matter of seconds" in which they approached and passed the livery cab. *See* Tr. 32. For the bulk of those seconds, the officers met and held Defendant's gaze and assessed his demeanor. Tr. 61, 77. Few of those seconds remained for the officers to make what was, under the circumstances, a tricky visual assessment. Not only were the officers focused elsewhere, but they were focused on a man sitting in the opposite corner of the cab from its front left wheel, whose location ostensibly revealed the violation to the officers. Officer Regnier was looking across his partner and through the officers' car, primarily at Defendant, and Sergeant Torres, though his view was less obstructed, was driving the officers' car and equally attentive to Defendant. Tr. 33, 60. Moreover, as I previously noted, "a stationary object may shift in one's visual perception as one moves past it," placing its position in con-

stant flux relative to objects only inches away. *Stewart,* 491 F.Supp.2d at 427. Given these objective circumstances, I hold that it would have been unreasonable for the officers to rely on their fleeting observation of the purported traffic violation, even if they truly believed that they had observed that violation. An unreliable observation would not have led "a reasonable and Cautious police officer, guided by his experience and training," to suspect that a traffic violation had been committed. *United States v. Shamsideen,* 03 Cr. 1313(SCR), 2004 WL 1179304 at *3, 2004 U.S. Dist. LEXIS 9555 at *12–*13 (S.D.N.Y. May 3, 2004)(quoting *United States v. Price,* 599 F.2d 494, 501 (2d Cir. 1979)).

### III. Conclusion

The Government has failed to prove by a preponderance of the evidence that Sergeant Torres and Office Regnier had a reasonable suspicion that the livery cab driven by Mr. Jimenez committed a traffic violation. As the officers did not have a reasonable suspicion of any other illegal activity, *see Stewart,* 491 F.Supp.2d at 428–30 (finding officers' suspicion as to Defendant himself too generalized to justify stop), I hold that the traffic stop violated the Fourth Amendment. Accordingly, I again grant Defendant's motion to suppress statements and physical evidence arising from the traffic stop of Mr. Jimenez's livery cab.

SO ORDERED.